911 So.2d 313 (2005)
F. Murray BIEDENHARN, Plaintiff-Appellant
v.
Ricky Lee CULP d/b/a Ricky Culp's Auto, Defendant-Appellee.
No. 39,680-CA.
Court of Appeal of Louisiana, Second Circuit.
August 26, 2005.
*314 Frederic C. Amman, III, Monroe, for Appellant.
Richard L. Fewell, Jr., for Appellee.
Before BROWN, WILLIAMS, GASKINS, CARAWAY, and LOLLEY, JJ.
*315 BROWN, C.J.
Plaintiff, F. Murray Biedenharn, brought the instant action against defendant, Ricky Lee Culp d/b/a Ricky Culp's Auto, seeking the return of a 1951 Ford panel truck he had hired Culp to restore, as well as $20,000 for the loss of use and enjoyment of the vehicle. According to Biedenharn, the parties initially agreed to a price on a parts plus labor basis. After he initially paid $12,628.06, Biedenharn claims that Culp agreed to complete the restoration for $3,000. Culp, however, disputes that the parties altered their agreement, and filed an answer and reconventional demand, claiming that Biedenharn owed an additional $34,779.46 for the restoration work (which included 579.25 labor hours) before Culp would return the vehicle. Culp sought payment of the balance due, together with penalties and attorney fees.
The trial court employed quantum meruit to determine the balance owed to Culp, awarding him the amount he sought in his reconventional demand, $34,779.46. Biedenharn has appealed from this adverse judgment. We amend the trial court's judgment, and, as amended, affirm.

Facts
In February 1998, F. Murray Biedenharn took his 1951 Ford truck to Ricky Culp's Auto for repair work. While there, Biedenharn observed Culp restoring a 1955 GMC truck. Biedenharn then asked Culp to restore his vehicle. At trial, Culp testified that he told Biedenharn that he was not in the auto restoration business, that the GMC was his own truck, and that he could not tell Biedenharn how much such a project would cost. Biedenharn decided that he wanted to hire Culp to restore his Ford using original parts. He and Culp entered into an oral agreement which provided that payment for the restoration work would be on a parts plus labor basis. Labor was to be paid at a rate $40 per shop hour.
On April 10, 1998, Culp presented Biedenharn with two invoices totaling $12,628.06 for work that had been done on the truck. Specifically, the bills indicate that the following work had been performed:
the body had been removed from the frame; the frame had been completely stripped down; the shocks, brakes, brake lines and fuel lines had been replaced; all four springs had been removed and replaced; the body had been straightened; the engine and transmission had been pulled off and tore (sic) down. (Culp's) total labor hours for both invoices was 128.7 hours.
In addition, outside work including sandblasting of the body and frame and machine shop and welding work had been done. According to Culp, the engine and transmission were completely rebuilt. The truck had been disassembled and had not been put back together. Culp stated that the wheels were on the frame and the brake lines were attached, but neither the motor nor the transmission had been installed, nor had the vehicle's interior been restored or the exterior painted.
Biedenharn testified that he was shocked at the amount of the invoices. He paid them anyway, then told Culp that he no longer wanted to pay for the restoration work on a parts plus labor basis and needed to know how much money it would take to complete the restoration. According to Biedenharn, Culp's response was "the worst of this thing is over" and he only had to "put the pieces back together." Biedenharn testified that after Culp told him it would take $3,000 to finish the job, he agreed to allow Culp to complete the restoration. At no time did he ever authorize Culp to spend more than an additional $3,000 on the continued project. *316 Biedenharn stated that he asked Culp about the cost of completion on several occasions after the parties' "new" agreement. Culp told him that he didn't have all the invoices together, so he couldn't give him any figures.
In July 2001, more than a year after the restoration had been completed, Culp told Biedenharn he could get the truck and presented Biedenharn with a bill in the amount of $34,779.46. This invoice was for reassembling and painting the truck, but did not include the extra amounts spent by Biedenharn on a Coca Cola graphics package ($4,000) and upholstery ($2,500). Biedenharn refused to pay the $34,779.46 and Culp refused to give Biedenharn the truck. Biedenharn testified that he contacted Culp at a later date and asked him to accept $3,000 for the return of the truck; Culp again refused and this action ensued.
Ricky Culp corroborated Biedenharn's testimony that the parties had an oral agreement to restore the truck for $40 per shop hour labor rate plus the cost of parts. Culp added that his normal shop labor rate was $50 per hour. Culp was adamant that there was not an agreement to finish the restoration (reassembly and painting) of the truck for $3,000 and testified that he told Biedenharn that he did not know how much it would take to complete the job. Culp then generally explained the steps involved in restoring the truck, including a search for parts, and also testified that he fronted the costs for all parts after Biedenharn's first payment. Culp stated that $3,000 would not have covered the cost of labor to put the truck back together.[1] Had Biedenharn told him that he was not willing to pay more than $3,000 for the remaining work, "that vehicle would have left my shop that day."
The July 2001 bill for $34,779.46 included restoration work done from April 1998 until August 1998; then, after a break of about 14 months, work done from November 1999 to July 2000. Although work was completed in July 2000, Biedenharn was not notified that the truck was ready until a year later in July 2001 when he was given the bill. The invoice presented to Biedenharn showed charges for: (1) parts  $6,574.53 plus a 10% charge; (2) outside repairs  $1,416.94 plus a 10% charge; (3) labor  579.25 hours at $40 per hour, for a total of $23,170; and (4) 9% tax in the amount of $2,818.85. The bill does not break down or specify the work performed in conjunction with the labor hours claimed. It simply showed the date, the employee who performed the work and the hours spent on each date.
On cross-examination, Culp testified that he included a markup for parts, outsourcing and labor in the first billing. With regard to the July 2001 bill, Culp testified on direct examination that he was unaware of the 10% markup; however, he stated that it was customary in the industry to charge a markup on parts. Biedenharn's counsel produced several copies of the two April 1998 bills, on which were highlighted amounts for different items. Attached to the bills were the corresponding invoices for the highlighted items showing amounts that were lower than the amounts billed. According to Biedenharn's counsel, after his calculation of the percentages, there was a markup of 3% to 115% on some of the items.
Both Biedenharn and Culp presented expert testimony with regard to the steps and costs involved in the restoration process, *317 as well as the quality of the work. Culp's expert, Bill Burns, was a retired co-owner of a business whose services included auto restoration. Burns had professionally restored vehicles for the past 18 years and had completed approximately 200 restorations.
Burns inspected and took photos of Biedenharn's truck after its restoration. Burns testified that during his inspection, he was looking for quality, fit and finish, meaning that the truck had been disassembled and restored as nearly as possible to its original factory version. He also inspected the quality of the paint and mechanical work performed. Burns opined that the truck was "an excellent example of restoration," and that the mistakes that he saw were "little things." With regard to the markup on the bills, Burns testified that it was industry custom to double the price paid for restoration parts because of the difficulty in locating them. Burns opined that the additional 579.25 labor hours to complete the restoration were reasonable. Burns stated that he couldn't be specific about what the Biedenharn restoration entailed because he wasn't there and doesn't know the problems that were encountered by Culp during this particular restoration job.
Biedenharn's expert, Arthur McMeans, III, testified that he had built or restored six "street rods" (except for paint and upholstery) as a hobby over a 15-year period of time. McMeans stated that he had never performed a classic restoration. He testified that although he had used modern parts to restore the street rods, he performed a frame off "restoration" on each one. McMeans opined that, based upon his observations of Biedenharn's truck, the restoration was "unacceptable" and did not meet his standards. He noted the presence of rough welding, sloppy glue spots, paint chips, rust, and stress cracks.[2]
McMeans testified that he "did not have a problem" with the labor hours and rate reflected in the first two bills (the invoices totaling $12,628.06), but that he disagreed with the number of hours required to complete the restoration. According to McMeans, "[I]f they can get it up to this point [disassembled] at 129 hours, it ain't (sic) no way it can take them that kind of time (579 hours) to finish it." McMeans' opinion was based in part on the completion of the paint job on his 1934 Ford, which took 196 hours at $17.50 per hour and which was done as fill-in work, as was done with Biedenharn's vehicle. McMeans added that the paint job on his car, which involved three colors, was more complicated than the single color paint job on Biedenharn's truck.
The trial court considered the evidence presented and found that there was an oral agreement between Biedenharn and Culp to restore the classic truck on a parts and labor basis. The court found no modification of this oral contract, contrary to Biedenharn's claim, then, based upon the doctrine of quantum meruit, rendered judgment in favor of Culp and against Biedenharn in the amount of $34,779.46, the total amount sought by Culp in his reconventional demand. The court denied that part of Culp's claim seeking penalties and attorney fees, based upon its finding that Culp's action was not one based upon an open account. From this judgment, Biedenharn has appealed.

Discussion

Quantum Meruit
Biedenharn takes issue with the trial court's utilization of the doctrine of quantum *318 meruit in determining the amount due Culp for the restoration work. Biedenharn asserts that because the trial court applied an incorrect principle of law, it failed to determine the correct amount of compensation due Culp. There is merit to both of these arguments.
Quantum meruit as a substantive basis of recovery is a common law concept not favored in Louisiana. Morphy, Makofsky & Masson, Inc. v. Canal Place 2000, 538 So.2d 569 (La.1989); Fogleman v. Cajun Bag & Supply Company, 93-1177 (La.App. 3d Cir.06/15/94), 638 So.2d 706, writ denied, 94-1900 (La.10/28/94), 644 So.2d 375; SMP Sales Management Inc. v. Fleet Credit Corp., 960 F.2d 557 (5th Cir.1992).
In Morphy, supra, at 574, the supreme court stated:
Thus the Civil Code articles on Obligations have long furnished the principles for interpreting contracts ambiguous only with regard to compensation or price for agreed upon services. Unfortunately for the purity of our civilian concepts, the cases in our jurisprudence which have applied these codal provisions have often referred to this reasonable value of services or equitable ascertainment of compensation or price as "quantum meruit" or an action in quantum meruit. Quantum meruit may well have been an ill-considered importation from the common law (see that criticism in Oil Purchasers v. Kuehling, 334 So.2d 420 (La.1976)); however, no great harm follows from that importation if we understand that numerous cases in our jurisprudence have used "quantum meruit" as a descriptive term, descriptive of the equitable principles of contract interpretation enunciated in La.Civ.Code arts. 1903 and 1965 [now art.2055], which were the substantive law bases for the decisions in these cases. See Porter v. Johnson, 408 So.2d at 967, n. 4.
Where an agreement exists but the price to be paid is not stated in exact or precise terms, the court in the context of contractual interpretation must supply the missing price. The technique or measure used to determine price varies according to the circumstances of each case. The method to determine price usually equals the fair market value for the goods or reasonable value for the services that were the object of the contract. Morphy, Makofsky & Masson, supra. A reasonable sum for services rendered usually includes the actual cost, including general overhead attributable to the project, and a reasonable profit. Morphy, Makofsky & Masson, supra; Skains v. White, 391 So.2d 1327 (La.App. 2d Cir.1980); Brummett v. Hamel's Dairy, Inc., 324 So.2d 502 (La. App. 2d Cir.1975).
Quantum meruit is not a civil law concept and should not be used in Louisiana. Instead, Louisiana principles of contract interpretation as set forth in the Civil Code provide the substantive basis for recovery. Such an error of law requires this court to conduct a de novo review. Doe v. DeSoto Parish School Board, 39,779 (La.App. 2d Cir.06/29/05), 907 So.2d 275.

The Agreement
Biedenharn does not dispute that the parties' original agreement was that the restoration would be performed on a parts plus labor basis, with a labor rate of $40 per shop hour. Instead, Biedenharn contends that the trial court erred in failing to find that the parties either modified their original contract or entered into a second agreement wherein they agreed that Culp would complete the truck's restoration for $3,000.
The party asserting the existence of an obligation must prove it by a preponderance *319 of the evidence. La. C.C. art. 1831; Suire v. Lafayette City-Parish Consolidated Government, 04-1459 (La.04/12/05), 907 So.2d 37; Kilpatrick v. Kilpatrick, 27,241 (La.App. 2d Cir.08/23/95), 660 So.2d 182, writ denied, 95-2579 (La.12/15/95), 664 So.2d 444. Likewise, the party claiming modification of an obligation must prove the facts or acts giving rise to the modification. La. C.C. art. 1831; L & A Contracting Co., Inc. v. Ram Industrial Coatings, Inc., 99-0354 (La.App. 1st Cir.06/23/00), 762 So.2d 1223, writ denied, 00-2232 (La.11/13/00), 775 So.2d 438.
An oral contract over $500 must be proved by at least one credible witness and other corroborating circumstances. La. C.C. art. 1846; Suire, supra; Kilpatrick, supra. The plaintiff or claimant may be the one credible witness. Suire, supra; Samuels v. Firestone Tire & Rubber Co., 342 So.2d 661 (La.1977); Kilpatrick, supra. "Other corroborating circumstances" need only be general in nature; independent proof of every detail of the agreement is not required. Id. As noted by this court in Kilpatrick, supra, however, this proof may not result from the plaintiff's own actions, Woodard v. Felts, 573 So.2d 1312 (La.App. 2d Cir.1991), and must come from a source other than the person urging the existence of the contract. Suire, supra; Hilliard v. Yarbrough, 488 So.2d 1038 (La. App. 2d Cir.1986); Pennington Construction, Inc. v. R A Eagle Corp., 94-0575 (La.App. 1st Cir.03/03/95), 652 So.2d 637.
Biedenharn's uncorroborated testimony, as was the claimant's statement in Kilpatrick, supra, is sufficient as the testimony of one credible witness required by La. C.C. art. 1846. However, we find, as did trial court, the he failed to supply the requisite "corroborating circumstances" also mandated by La. C.C. art. 1846. The language of article 1846 is clear: without the necessary corroborating evidence, a claimant's testimony, standing alone, is insufficient to prove the existence or amendment of an oral contract.
The agreement was that Culp would restore the truck for costs plus labor. The labor charge was open-ended and dependent on the number of hours worked. We have examined the evidence of record and find that the total costs incurred by Culp during the reassembly phase of the restoration were $8,790.61. This amount includes the 10% markup on parts and outsource work. We cannot agree, however, that Culp's labor, 579.25 hours at $40 per hour, for a total of $23,170, was proven.
Culp testified about the work performed after the initial bill. Employees who did the work, however, did not testify. The document presented in evidence to show the hours worked shows that from May 1998 to August 1998, Tim Tucker worked 62.5 hours and Josh Culp worked 9.25 hours. Nothing in the record establishes the nature of the work they did.[3] During this same period in 1998, Randy Culp worked 186.75 hours. According to (Ricky) Culp's testimony, Randy did the painting. Randy did not testify. By August 1998, the vehicle had been reassembled and painted.
No work was done by Culp on the vehicle during the next 14 months. (Ricky) Culp testified that the truck was removed from his garage during this time for graphics and interior work; the charges for this work were paid by Biedenharn directly to the persons who performed this work. Thereafter, from November 1999 *320 until July 2000, only Randy, the painter, worked on the truck, allegedly for 320.25 hours. Again, Randy did not testify. (Ricky) Culp testified that Randy painted the truck in 1998, and then in 1999 and 2000, Randy applied a clear coat which was needed after the graphics were affixed. This was done as fill-in work.
Before the first invoices, which were paid by Biedenharn, substantial work was performed and this is supported by both documents and testimony. What was left was to reassemble and paint the vehicle. Based on this record or lack thereof, we reject the assertion that 579.25 labor hours were necessary or reasonable after the first initial billing. The evidence shows that the bulk of the restoration was completed. Culp's labor at that time was 129 hours. This was supported by documents and testimony. No such evidence was forthcoming to support the additional claimed 579 hours to finish the restoration. As Biedenharn's expert testified "[I]f they can get it up to this point at 129 hours, it ain't (sic) no way it can take them that kind of time to finish it." A reasonable award to reassemble and paint a completely stripped, sanded, primed, and rebuilt truck is not greater than what it took to do the bulk of the work. Based on the evidence, we feel that 129 hours for this additional work is reasonable. Thus, we reduce the labor charge from $23,170 to $5,160 with a 9% tax on this amount which is $464.40. Added to the costs expended, $8,790.61, the total Culp is entitled to is $14,415.01.

Conclusion
For the reasons set forth above, the judgment of the trial court is amended as follows:
IT IS ORDERED, ADJUDGED, and DECREED that there be judgment in favor of Plaintiff in Reconvention, Ricky Lee Culp d/b/a Ricky Culp's Auto and against defendant in reconvention, F. Murray Biedenharn, in the amount of $14,415.01 with legal interest from date of the reconventional demand. All other claims of all parties are rejected. Costs are assessed equally between the parties.
Amended and, as Amended, Affirmed.
WILLIAMS, J., dissents in part with written reasons.
GASKINS, J., dissents.
WILLIAMS, J., dissenting in part.
With regard to Culp's reconventional demand, I respectfully dissent from the majority opinion.
The majority has concluded that Culp failed to present sufficient evidence to prove that the total amount of labor for the July 2001 bill was 579.25 hours, and thus, the trial court erred in finding that based on the doctrine of quantum meruit, Biedenharn owed Culp $34,779.46 for the completion of the classic restoration of the truck. The majority's conclusion is erroneous.
The majority has failed to recognize that it applied the doctrine of quantum meruit in determining the new amount due to Culp. The civilian concept of quantum meruit is the measure of compensation or price unstated in a contract. In other words, a contract exists, and the court merely supplies a price. Dumas and Associates, Inc. v. Lewis Enterprises, Inc., 29,900 (La.App. 2d Cir.12/22/97), 704 So.2d 433. Thus, in the instant case, because there was an agreement to perform the restoration, but there was no agreement with regard to the exact amount of compensation involved, the doctrine of quantum meruit is applied to fix the amount to be paid to Culp for his services.
Moreover, the majority has assumed the role of trier of fact in determining the *321 amount due to Culp. The majority has "reevaluated" the evidence to support its conclusion that Culp failed to prove his reconventional demand for $34,779.46. Specifically, the majority has found that Burns' expert testimony was not sufficient to support Culp's claim that it took 579.25 hours to complete the restoration of the truck. Thus, the majority has implicitly agreed with McMeans' expert testimony that the amount of hours was "excessive" and disregarded the trial court's finding that Burns' expert testimony was more credible than McMeans' expert testimony.
Credibility determinations, including the evaluation of expert testimony, are factual issues to be resolved by the trier of fact. When testimony conflicts, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed, even if the appellate court concludes that its own evaluations and inferences are as reasonable as those made by the lower court. When findings of fact are based upon determinations of the credibility of witnesses, the manifest error-clearly wrong standard mandates great deference to the determinations made by the trier of fact. West v. Williams, 30,842 (La.App. 2d Cir.8/19/98), 717 So.2d 1224.
Here, the record shows that there was ample evidence to support the trial court's conclusion that the total amount of labor for the July 2001 bill was 579.25 hours. Consequently, based on this record, I must conclude that the trial court was not clearly wrong in finding that Biedenharn owed Culp $34,779.46 for the restoration of the truck. I would affirm the trial court's award.
I respectfully dissent.
NOTES
[1] As explained later, it appears that Tim Tucker reassembled the truck allegedly taking 62 hours at $40 per hour, which is $2,480.
[2] Some of these imperfections were noted by Burns, who pointed out that these were more likely the result of the car having been stored for more than a year.
[3] A fair assumption that can be made from this information is that Tim Tucker reassembled the truck.